# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 16 CR 438-1 |
| | ) | |
| v. | ) | Judge John Z. Lee |
| | ) | |
| ARTEM VAULIN, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Artem Vaulin ("Vaulin") has been indicted along with two co-defendants on various charges stemming from his alleged involvement in operating a BitTorrent website, as well as other related websites. The charges in the indictment comprise criminal copyright infringement under 17 U.S.C. § 506 of the Copyright Act, conspiring to commit criminal copyright infringement under 18 U.S.C. § 371, aiding and abetting criminal copyright infringement under 18 U.S.C. § 2, money laundering under 18 U.S.C. § 1956(a)(2)(A) and § 1956(a)(2)(B)(i), conspiring to commit money laundering under 18 U.S.C. § 1956(h), and aiding and abetting money laundering, again under 18 U.S.C. § 2.

Vaulin, who is currently in Poland and contesting extradition, has moved to dismiss the indictment. In response, the government argues among other things that, because Vaulin is a fugitive and refuses to appear in this proceeding, the Court should decline to entertain his motion under the fugitive disentitlement doctrine. For the following reasons, the Court finds that the fugitive disentitlement doctrine applies here. Nevertheless, following the path charted by the Seventh

Circuit in *United States v. Bohhari*, 757 F.3d 664 (7th Cir. 2014), and for the sake of judicial efficiency, the Court reviews and denies Vaulin's motion to dismiss [26] on the merits.

## I.      Background

The following allegations are taken from the indictment and accepted as true in evaluating Vaulin's motion to dismiss.  *United States v. Moore*, 563 F.3d 583, 586 (7th Cir. 2009).

At all times relevant to the indictment, Vaulin and his co-defendants operated Kickass Torrents ("KAT"), "a commercial website that facilitated and promoted the reproduction and distribution of copyrighted content over the Internet without the authorization of the copyright owners."  Indictment, Count 1 ¶¶ 1(b), 1(e), ECF No. 19.  KAT solicited, collected, and indexed "torrent files."  *Id.*, Count 1, ¶¶ 1(b), 4, 9.  A torrent file contains instructions for identifying other users of the so-called "BitTorrent" network.  *Id.*, Count 1, ¶ 1(a).  The file further instructs users on how to download copies of media from other users over the Internet using a BitTorrent client, or software.  *Id.*  Torrent files, therefore, are not media themselves; they are a means of connecting a user desiring a copy of media with other users willing to distribute.  By obtaining torrent files from sites like KAT, users of a BitTorrent network locate one another, and, by use of a BitTorrent client, distribute copies of media or download their own.  *Id.*[1]

---

[1]      For a useful overview of BitTorrent technology, see Sean B. Karunaratne, Note, *The Case Against Combating Bittorrent Piracy Through Mass John Doe Copyright Infringement Lawsuits*, 111 Mich. L. Rev. 283, 289–90 (2012).

KAT had a large following of users—"[m]illions of members . . . many of whom resided in the United States." *Id.*, Count 1 ¶ 1(b). KAT's network utilized computer servers throughout the world, including servers located in Chicago. *Id.*, Count 1 ¶ 18. The site "generate[d] millions of dollars from the unlawful reproduction and distribution of copyright-protected media, including movies—some of which were still playing in theaters—television shows, music, video games, computer software, and electronic books." *Id.*, Count 1 ¶ 3. Vaulin and his co-defendants accomplished this by "soliciting and causing others to solicit extensive online advertising, sales of KAT's visitor traffic, and KAT user donations." *Id.*, Count 1 ¶ 13.

As one might surmise from this amount of revenue, the KAT website was quite elaborate. Torrent files were indexed by genre in order to allow KAT users "to easily browse, locate, and obtain their desired infringed copyrighted content." *Id.*, Count 1 ¶¶ 9–10. To assist in the downloading and distribution process, Vaulin and his co-defendants developed and offered their own BitTorrent client for their users. *Id.*, Count 1 ¶ 19. Users notified one another when new content was available, and the website encouraged and rewarded frequent users with awards and accolades. *Id.*, Count 1 ¶¶ 6, 11. At the same time, Vaulin and his co-defendants instituted a code of conduct that banned users for "uploading torrents that contained malware, promoted other torrent sites, or facilitated the download of 'banned' content." *Id.*, Count 1 ¶ 12. There were no sanctions, however, for uploading torrent files for copyright-protected content. *Id.*

As a result of KAT's success, Vaulin and his co-defendants received donations from KAT users and made millions from online advertising revenues. *Id.*, Count 1 ¶¶ 7, 13. But, given that KAT facilitated the unauthorized exchange of copyrighted material, they hid these proceeds in bank accounts owned by various shell companies. *Id.*, Count 1 ¶ 14. In addition, they were forced to change KAT's domain name at various times, "in part to avoid and circumvent court orders." *Id.*, Count 1 ¶ 16. And, in order to hide their operations, Vaulin and his co-defendants housed KAT and related sites under a Ukranian company called "Cryptoneat." *Id.*, Count 1 ¶ 24.

In addition to KAT, Vaulin and his co-defendants operated a number of "direct download websites." *Id.*, Count 1 ¶ 21. These websites, rather than collecting torrent files, made unauthorized copies of copyrighted works directly available for users to download. *Id.* Vaulin and his co-defendants also hid operation of the direct download websites by way of Cryptoneat. *Id.*, Count 1 ¶ 24.

Based on these alleged activities, the indictment charges Vaulin and his co-defendants with sixteen counts of criminal conduct. Count 1 charges them with conspiring to violate 17 U.S.C. § 506(a)(1)(A) and § 506(a)(1)(C), two different provisions of the criminal copyright statute.[2] Count 2 charges them with violating

---

[2] Section 506(a)(1)(A) makes it illegal for any person to willfully infringe a copyright "for purposes of commercial advantage or private financial gain." 17 U.S.C. § 506(a)(1)(A).

Section 506(a)(1)(C) prohibits a person from willfully infringing a copyright "by the distribution of a work being prepared for commercial distribution, by making it available on a computer network accessible to members of the public, if such person knew or should have known that the work was intended for commercial distribution." 17 U.S.C. § 506(a)(1)(C).

and aiding and abetting a violation of 17 U.S.C. § 506(a)(1)(C) in relation to the commercial movie, "The Butler," on September 17, 2013. Counts 3 through 12 charge the same, but in relation to ten additional commercial movies over a period spanning June 24, 2016, through July 7, 2016. Lastly, Counts 13 through 16 charge money laundering, conspiracy to commit money laundering, and aiding and abetting money laundering in connection with these infringement activities.

## II.    Legal Standard

Under Rule 7(c)(1), "[t]he indictment or information must be a plain, concise, and definite statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). "For each count, the indictment or information must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated." *Id.* An indictment satisfies Rule 7(c)(1) if it "(1) states all the elements of the crime charged; (2) adequately informs the defendant of the nature of the charges so that he may prepare a defense; and (3) allows the defendant to plead the judgment as a bar to any future prosecutions." *United States v. White*, 610 F.3d 956, 958 (7th Cir. 2010).

If an indictment "'tracks' the words of a statute to state the elements of the crime," it generally suffices, and "while there must be enough factual particulars so the defendant is aware of the specific conduct at issue, the presence or absence of any particular fact is not dispositive." *Id.* "Indictments are reviewed on a practical basis and in their entirety, rather than 'in a hypertechnical manner.'" *United States v. Smith*, 230 F.3d 300, 305 (7th Cir. 2000) (quoting *United States v.*

*McNeese*, 901 F.2d 585, 602 (7th Cir. 1990)). When doing so, the allegations in the indictment are accepted as true and viewed in a light most favorable to the government. *Moore*, 563 F.3d at 586; *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999).

## III.    Analysis

Vaulin seeks to dismiss the indictment on a number of grounds. But because Vaulin is in Poland and currently resisting extradition to the United States, the Government first asks that the Court deem him to be a fugitive and exercise its discretion to dismiss his motion without prejudice under the fugitive disentitlement doctrine.

### A.    Fugitive Disentitlement Doctrine

The fugitive disentitlement doctrine vests courts with discretion to dismiss a request for relief where "the party seeking relief is a fugitive while the matter is pending." *Degen v. United States*, 517 U.S. 820, 824 (1996). The Supreme Court has explained that

> [n]o persuasive reason exists why [a court] should proceed to adjudicate the merits of a criminal case after the convicted defendant who has sought review escapes from the restraints placed upon him pursuant to the conviction. While such an escape does not strip the case of its character as an adjudicable case or controversy, we believe it disentitles the defendant to call upon the resources of the [c]ourt for determination of his claims.

*Molinaro v. New Jersey*, 396 U.S. 365, 366 (1970) (per curiam).

Three core principles animate the doctrine. First, as a practical matter, it is difficult to enforce a judgment against a fugitive who is, by definition, outside of the

court's reach. *Degen*, 517 U.S. at 824. The Seventh Circuit has likened this principle to "mutuality," in that "if [a criminal defendant] wants the United States to be bound by a decision . . . he should be similarly willing to bear the consequences of [that] decision." *In re Hijazi*, 589 F.3d 401, 413 (7th Cir. 2009). Second, disentitlement "redress[es] the indignity visited upon the District Court by [a fugitive's] absence from the criminal proceeding," essentially denying the fugitive the benefit of unclean hands. *Degen*, 517 U.S. at 824, 828. And, finally, the doctrine discourages escape and promotes voluntary surrender in order to ensure courts are respected and operate efficiently. *Id.*

These principles, however, do not mandate invocation of the doctrine. The Supreme Court, while "acknowledg[ing] disquiet at the spectacle of a criminal defendant reposing [abroad], beyond the reach of our criminal courts, while at the same time mailing papers to the court . . . and expecting them to be honored," has indicated that invoking the doctrine to deny all relief is an extreme sanction to be reserved only for those circumstances in which it is warranted. *Id.* at 828–29.

While the fugitive disentitlement doctrine originated as a response to appeals of convicted defendants on the run, *e.g.*, *Molinaro*, 396 U.S. at 366, the Seventh Circuit has suggested that it can apply where a fugitive defendant seeks to dismiss an indictment, *e.g.*, *Bokhari*, 757 F.3d at 671–73 & n.7; *cf. Hijazi*, 589 F.3d at 412–14. In *Hijazi*, for example, the defendant faced criminal charges in the United States stemming from certain dealings with the U.S. Army and one of its contractors in Kuwait. 589 F.3d at 403. Hijazi voluntarily surrendered to Kuwaiti

authorities, but Kuwait refused to extradite him.  *Id.* at 405.  Meanwhile, Hijazi filed a motion to dismiss the indictment through attorneys in the United States, arguing in part that the statutes under which he was charged did not apply extraterritorially.  *Id.*  The district court held that the fugitive disentitlement doctrine did not directly apply to Hijazi, given that he had not been convicted of a crime, had never even visited the United States, and voluntarily surrendered in Kuwait.  *Id.* at 406.  The court nevertheless reasoned that, because Hijazi had little to lose from filing the motion, mutuality concerns undergirding the doctrine required that his motion be denied and declined to enter a ruling on the merits.  *Id.*

The Seventh Circuit reversed.  It began by explaining why a writ of mandamus should issue to direct the district court to rule on Hijazi's motion, observing in part that his motion raised "importan[t] and delica[te]" questions as to the extraterritorial reach of the statutes at issue.  *Id.* at 408–12.  Then, addressing the fugitive disentitlement doctrine, the court noted that Hijazi had only set foot in the United States once for reasons unrelated to the case.  *Id.* at 412.  Thus, in the court's view, Hijazi "did not flee from the jurisdiction or from any restraints placed upon him."  *Id.*  This, in light of Hijazi's voluntary surrender to Kuwaiti authorities and their ability to extradite him if they so wished, led the court to conclude that the fugitive disentitlement doctrine did not apply.  *Id.* at 412–13.  Finally, the court held that the district court had undervalued the adverse consequences that Hijazi would face if he lost the motion to dismiss.  *Id.* at 413.  Highlighting the serious risk of extradition he could face if he ventured outside of Kuwait, the court reasoned

that there was not such a mutuality deficit that the district court should refrain from deciding his motion. *Id.* at 413–14. The Seventh Circuit concluded by commenting that, "[o]utside of the core fugitive disentitlement context, the Supreme Court has indicated that disentitlement is 'too blunt an instrument' to redress the indignity of a defendant's absence." *Id.* at 414 (quoting *Degen*, 517 U.S. at 828).[3]

While *Hijazi* identifies circumstances in which a court should be wary of invoking the fugitive disentitlement doctrine, the Seventh Circuit has more recently discussed circumstances in which it may be proper to do so. First, in *Bokhari*, the defendant faced an eight-count indictment for an illegal scheme he perpetrated while living in the United States. 757 F.3d at 666. He took refuge in Pakistan, where he was also a citizen. *Id.* The United States requested extradition, but the governments were unable to reach an agreement. *Id.* at 666–67. United States officials therefore secured a notice through Interpol instructing all member states to arrest Bokhari if he entered their jurisdiction. *Id.* at 667. And Bokhari, through his attorneys, filed a motion to dismiss the indictment in the United States. *Id.* The district court denied the motion, reasoning that the fugitive disentitlement doctrine precluded the relief he sought. *Id.* at 667–68.

The Seventh Circuit affirmed. It began by discussing "whether Bokhari meets the legal definition of a fugitive." *Id.* at 672. Bokhari argued that he was not a fugitive because he left the United States a few years prior to the indictment,

---

[3] The court did not elaborate on what it considered the "core fugitive disentitlement context," but presumably, it meant to refer to instances in which a convicted criminal defendant flees after appealing his conviction.

citing *Hijazi*. *Id.* The government countered by noting that, unlike in *Hijazi*, Bokhari had lived in the United States for a decade, and his prosecution concerned actions he was alleged to have taken here. *Id.*

In discussing the issue, the Seventh Circuit found the government's position "persuasive[]" and favorably cited authorities establishing a broad definition of fugitive, including one that would "'require only proof of absence from the indicting jurisdiction regardless of the defendant's intent.'" *Id.* (quoting *United States v. Marshall*, 856 F.3d 896, 898 (7th Cir. 1988)). But the court stopped there, noting that "the term 'fugitive' may take on subtly different meanings as it is used in a variety of legal contexts," and declined to rule on the fugitive disentitlement issue. *Id.* The court then proceeded to deny Bokhari's motion on the merits. In a noteworthy footnote, however, the court clarified that its opinion should "in [no] way suggest that the district court [ ] err[ed] in finding that Bokhari was a fugitive, or that it abused its discretion in applying the doctrine to him." *Id.* at 673 n.7. Indeed, the court cited with approval the district court's statement that "[t]he fugitive disentitlement doctrine stands for the proposition that those who flee from judicial process may not benefit from it," observing that Bokhari would not benefit from filing his motion (consistent with the core purpose of the fugitive disentitlement doctrine) because the motion was being denied. *Id.* (internal quotation marks and citation omitted).

In a second decision post-*Hijazi*, the Seventh Circuit envisioned a similarly broad definition of fugitive. *In re Kashamu*, 769 F.3d 490 (7th Cir. 2014), concerned

a defendant living in Nigeria that refused to appear to face criminal charges in the United States and resisted extradition proceedings in the United Kingdom. *Id.* at 492. He filed a motion to dismiss the indictment on personal jurisdiction and speedy-trial grounds. *Id.* The court rejected the merits of his challenge. In *dicta*, however, it stated,

> It's true that Kashamu didn't literally flee the United States, since he was never in the United States. But he knew he was under indictment in this country, yet rather than come here to fight the validity of the government's charges, he fought tooth and nail (and successfully) to prevent his being extradited from the United Kingdom to the United States. He not only was functionally a fugitive . . . he deliberately forewent the opportunity for a speedy trial.

*Id.* at 493 (internal citations omitted). The court advised that "[i]f [Kashamu] wants to fight the charges, he has only to fly from Lagos to Chicago; there are loads of reasonably priced flights." *Id.* at 494.

Based on these authorities, and in light of the principles undergirding the doctrine, the Court is persuaded that the elements of the fugitive disentitlement doctrine are met in this case. All three principles that the Supreme Court discussed in *Degen*—enforcement and mutuality, redressing the indignity of absence, and encouraging voluntary surrender—are implicated here. As long as Vaulin is in Poland, he is not within the Court's reach. And, as far as the Court is aware, he is actively resisting extradition efforts. His attorneys represented at the most recent status hearing that there is a "real possibility" that he will agree to appear here, but also indicated that he is actively appealing the Polish courts' decision to extradite

him, a process which could take years. Thus, insofar as Vaulin is interested in participating here, he appears willing to do so only from a safe distance.

As for the second and third principles, Vaulin should not reap the benefit of purposefully evasive behavior, and issuing a ruling in these circumstances could encourage such behavior, rather than voluntary surrender. Denying Vaulin's motion without prejudice to renewal upon appearing before this Court is an appropriate way of honoring these principles, and is not "an excessive response to the concerns here advanced." *Degen*, 517 U.S. at 829; *see also Ortega-Rodriguez v. United States*, 507 U.S. 234, 246 (1993) ("[F]ugitivity while a case is pending before a district court, like other contempts of court, is best sanctioned by the district court itself.").

Furthermore, the Court is persuaded that invocation of the doctrine is warranted under the Seventh Circuit's fugitive disentitlement doctrine precedents. Vaulin meets the broad definition of a fugitive that the Seventh Circuit has endorsed in *Bokhari* and *Kashamu*. Vaulin knows of the charges against him and actively resists appearing here. *Bokhari*, 757 F.3d at 672. Rather than appear, he fights extradition from Poland "tooth and nail." *Kashamu*, 769 F.3d at 493. Unlike in *Hijazi*, on which Vaulin principally relies, he is not committed to the authority of a country that refuses to extradite him. In fact, the authorities in Poland have expended considerable efforts to do so. Vaulin could appear here if he wishes, but has chosen not to.

Moreover, the extraterritoriality concerns that the Seventh Circuit expressed in *Hijazi* are not present in Vaulin's case. As explained in greater detail below, notwithstanding Vaulin's insistence that this prosecution has nothing to do with conduct in the United States, the indictment repeatedly alleges conduct that occurred in the United States. Thus, the question of extraterritorial application in this case is not "importan[t] and delica[te]," *Hijazi*, 589 F.3d at 408, but ancillary and straightforward. Vaulin is a fugitive disentitled to the redress he seeks.

That said, the Court is mindful of the admonition by the Supreme Court and Seventh Circuit that district courts should apply the fugitive disentitlement doctrine with caution. *Degen*, 517 U.S. at 828; *Hijazi*, 589 F.3d at 414. Accordingly, the Court will follow the approach taken by the Seventh Circuit in *Bokhari* and proceed to consider the merits of Vaulin's motion, pausing only to note that, because the motion lacks merit, Vaulin "will receive no benefit from filing his motion to dismiss the indictment." *Bokhari*, 757 F.3d at 672–73 & n.7.

## B. Sufficiency of the Indictment

Vaulin raises a number of challenges to the sufficiency of the indictment. First, as noted above, he contests the sufficiency of the indictment's allegations of criminal copyright infringement within the United States and contends that he cannot be prosecuted under the Copyright Act for any extraterritorial infringement. Next, Vaulin challenges the Government's core theory of criminal copyright infringement, maintaining that his conduct is not actionable under the Copyright Act. Specifically, he argues that the torrent files he is accused of producing and

hosting are not content protected under the Act, that he cannot be prosecuted for secondary infringement of the protected content referenced in the indictment, and that, if he can, the statutes he is charged with violating are unconstitutionally vague. Finally, Vaulin asserts that, assuming the validity of the Government's theory *arguendo*, the indictment's allegations nevertheless fail to satisfy the specificity required by Rule 7(c)(1). The Court will address each of these arguments in turn.

### 1.      Location of the Underlying Criminal Conduct

Vaulin first argues that the indictment fails to adequately allege criminal infringement occurring in the United States, and therefore asserts that the indictment improperly seeks to inculpate him for extraterritorial infringement that cannot be prosecuted under the Copyright Act. Def.'s Mem. at 15–16.[4] Vaulin is correct that, as a general matter, the Copyright Act does not apply extraterritorially to reach acts of infringement that occur entirely abroad. *E.g.*, *Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*, 24 F.3d 1088, 1094, 1098 (9th Cir. 1994). But the core theory underlying the indictment is that Vaulin aided, abetted, and conspired with users of his network to commit criminal copyright infringement in the United

---

[4]      At oral argument, the Government directed the Court to authority holding that, in the civil context, extraterritorial limitations on the Copyright Act are properly treated as an element of a claim under the Act, and not as limiting federal courts' subject matter jurisdiction. Oral Arg. Tr. 34:1–8; *see Litecubes, LLC v. N. Light Prod., Inc.*, 523 F.3d 1353, 1368 (Fed. Cir. 2008). Vaulin appears to agree that the Government at this point need only allege, rather than prove, that infringement occurred domestically. Def.'s Mem. at 15 (arguing that the indictment is defective because it "fail[s] to allege actual infringements in the territory of the United States"); *see also* Oral Arg. Tr. at 17:24–18:5.

States.[5] The first paragraph of the indictment, which is incorporated throughout, alleges that "[m]illions" of Vaulin's users resided in the United States. Indictment, Count 1 ¶ 1(b). The indictment goes on to allege that these users "uploaded" and "download[ed]" content, *id.*, Count 1 ¶ 5, and "obtain[ed] [ ] desired infringed copyrighted content," *id.*, Count 1 ¶ 10. When viewed in a light most favorable to the Government, as the Court must do at this preliminary stage, the indictment alleges acts of domestic infringement.

Moreover, in setting out the conspiracy count, the indictment further states that Vaulin "made available and caused others to make available without authorization vast amounts of copyrighted content on KAT to millions of individuals in the United States by collecting and uploading torrent files," *id.*, Count 1 ¶ 4, that KAT used a "network of computer servers from around the world, including computer servers located in Chicago, Illinois," *id.*, Count 1 ¶ 18, and that various overt acts in furtherance of the conspiracy occurred in the United States, *e.g.*, *id.*, Count 1 ¶¶ 26(b), 26(e), 26(g), 26(k), 26(n)–(o). The aiding and abetting counts similarly allege that acts of infringement and acts of aiding and abetting infringement occurred in this district. *Id.*, Count 2 ¶ 2; *id.*, Counts 3–12 ¶ 2. At this stage, the indictment's allegations of wrongdoing occurring in the United States are sufficient, and Vaulin's motion to dismiss the indictment on this basis is denied.

---

[5] As a general matter, "the extraterritorial reach of an ancillary offense like aiding and abetting or conspiracy is coterminous with that of the underlying criminal statute." *United States v. Ali*, 718 F.3d 929, 939 (D.C. Cir. 2013).

### 2. Core Theory of Infringement

Next, Vaulin challenges the Government's underlying theory of criminal copyright infringement. He argues that the indictment (1) improperly charges criminal infringement of torrent files; (2) predicates criminal liability based on inapplicable theories of secondary liability viable only in the civil context; and (3) seeks to apply the statutes at issue in a manner that is unconstitutionally vague.

### i. Conduct Related to Torrent Files

Vaulin first contends that, because torrent files are not themselves protected content under the Copyright Act, there can be no criminal liability associated with downloading or distributing them. Def.'s Mem. at 1, 7–9. This argument, however, misunderstands the indictment. The indictment is not concerned with the mere downloading or distribution of torrent files. Granted, the indictment describes these files and charges Vaulin with operating a website dedicated to hosting and distributing them. *Id.*, Count 1, ¶¶ 1(a), 4. But the protected content alleged to have been infringed in the indictment is a number of movies and other copyright-protected media that users of Vaulin's network purportedly downloaded and distributed without authorization from the copyright holders. *Id.*, Count 1, ¶¶ 3, 26(j), 26(v); *id.*, Count 2 ¶ 2; *id.*, Counts 3–12 ¶ 2. The indictment describes the torrent files merely as a means of obtaining the copyrighted movies and other media.

Vaulin also makes the related argument that, because torrent files themselves are not protected content under the Copyright Act, an agreement to

download and distribute them cannot constitute a conspiracy to commit criminal copyright infringement, as charged in Count 1 of the indictment. Reply at 13–14, ECF No. 35. Again, this argument misconstrues the indictment. Count 1 of the indictment alleges that Vaulin and his co-defendants "made available and caused others to make available without authorization vast amounts of copyrighted content on KAT . . . by collecting and uploading torrent files to KAT, and soliciting and inducing KAT's registered users to upload torrent files to KAT." *Id.*, Count 1 ¶ 4. It is true that this allegation alone would not suffice to establish criminal conspiracy, given that torrent files are not protected content under the Copyright Act. But Count 1 does not stop there. The indictment explains that torrent files were a means of "allowing KAT users to easily browse, locate, and obtain their desired infringed copyrighted content," *i.e.*, movies to which the files related. *Id.*, Count 1, ¶ 10. Thus, Count 1 alleges that Vaulin and his co-defendants conspired to not only upload torrent files, but to do so in order to further acts of criminal copyright infringement by KAT's users.

What is more, Count 1 charges not only Vaulin and his co-defendants, but "others known and unknown" with conspiring to commit the alleged acts of infringement. *Id.*, Count 1 ¶ 2. Thus, the indictment is fairly construed as alleging an agreement between Vaulin and KAT's users to download and distribute infringed copyrighted content by using torrent files. *See* Oral Arg. Tr. at 39:4–7. Finally, in addition to alleging a conspiracy to commit copyright infringement based on conduct related to torrent files, the indictment also alleges a conspiracy based on

Vaulin and his co-defendants' distribution of copyrighted content through direct download websites. Indictment, Count 1 ¶¶ 21–25. Thus, the conspiracy alleged in the indictment goes far beyond merely uploading and distributing torrent files, and Vaulin's motion to dismiss the indictment on this basis is denied.[6]

## ii. Liability for Criminal Copyright Infringement

Vaulin further contends that the indictment seeks to charge Vaulin with secondary liability for criminal copyright infringement, which is only valid in the civil context. Def.'s Mem. at 9–12. In the civil context, "[o]ne infringes [a copyright] contributorily by intentionally inducing or encouraging direct infringement . . . and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005). Importantly, contributory and vicarious infringement are common law principles, *id.*, and are not theories of liability enumerated in the Copyright Act. For this reason, Vaulin argues that there can be no liability for criminal contributory and vicarious infringement. He points out that federal crimes are "solely creatures of statute," *Liparota v. United States*, 471 U.S. 419, 424 (1985), thereby precluding importation of common law secondary liability principles. He also references the Supreme Court's acknowledgement of "the wisdom of leaving it to the legislature to define crime and prescribe penalties" for

---

[6]     At one point, Vaulin contends that the indictment is deficient because, to the extent that it alleges a violation of 17 U.S.C. §506(a)(1)(A), it does not allege with sufficient specificity that Vaulin knowingly and willfully conspired with or aided and abetted KAT users' efforts to commit infringement "for the purpose of commercial advantage or gain." But the Court finds that the allegations in the indictment satisfy Rule 7(c)(1) for this purpose, particularly when they are viewed in the light most favorable to the government.

criminal copyright infringement. *Dowling v. United States*, 473 U.S. 207, 228 (1985). And he invokes the rule of lenity, which provides that ambiguity in the scope of a criminal statute should be resolved in favor of the defendant. *E.g.*, *Skilling v. United States*, 561 U.S. 358, 410–11 (2010).

The Government takes no issue with this line of reasoning. But, as should be clear by now, the indictment does not charge Vaulin with common law secondary liability that the Government seeks to import into 17 U.S.C. § 506.[7] Rather, the indictment relies on the text of the congressionally enacted conspiracy and aiding and abetting statutes, 18 U.S.C. § 371 and 18 U.S.C. § 2. The first criminalizes "two or more persons conspir[ing] [ ] to commit *any offense against the United States*." 18 U.S.C. § 371 (emphasis added). The second applies to "[w]hoever commits *an offense against the United States* or aids, abets, counsels, commands, induces or procures its commission." 18 U.S.C. § 2 (emphasis added); *see United States v. Pino-Perez*, 870 F.2d 1230, 1233 (7th Cir. 1989) ("Congress doesn't have to think about aider and abettor liability when it passes a new criminal statute, because [18 U.S.C. § 2(a)] attaches automatically. The question is not whether [18 U.S.C. § 2(a)] is applicable—it always is."). Thus, the indictment charges Vaulin not with crimes

---

[7]  Although the indictment is not premised on common law theories of secondary liability, Vaulin raises an issue as to whether KAT's torrent network is "capable of substantial noninfringing uses," a defense to contributory infringement in the civil context. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 442 (1984). While it is true that, "[i]n order to understand the meaning of criminal copyright infringement," courts have "resort[ed] to the civil law of copyright," *United States v. Cross*, 816 F.2d 297, 303 (7th Cir. 1987), it is not clear that the defense would apply here, given important differences between contributory infringement and criminal liability under the conspiracy and aiding and abetting statutes, as discussed below. But, even if the defense were to apply, the defense is unavailable where there is evidence of "statements or actions directed to promoting infringement," as alleged here. *Grokster*, 545 U.S. at 935.

based upon common law theories, but for conduct made unlawful under unambiguous statutes.

Vaulin nevertheless argues that these statutes (or, at least, 18 U.S.C. § 2)[8] do not apply to the present version of the Copyright Act. Reply at 3, 7. He points out that the 1909 version of the Copyright Act contained language expressly criminalizing aiding and abetting copyright infringement, but that language was removed from the present version of the Act enacted in 1976. Copyright Act, ch. 320, § 28, 35 Stat. 1075, 1082 (1909), *amended by* 17 U.S.C. § 506. From this, Vaulin concludes that, because Congress removed this language from the Copyright Act, there can be no criminal liability for aiding and abetting infringement.

This argument, however, misses the mark. When Congress amended the Copyright Act in 1976, 18 U.S.C. § 2—which, by its terms, applies to every criminal offense—was in force. For this reason, there was no need to include language within the Copyright Act itself that criminalized aiding and abetting criminal infringement. Doing so would have been redundant. Without any indication from the text of 17 U.S.C. § 506 that 18 U.S.C. § 2 should not apply, the Court must conclude that it does. *Pino-Perez*, 870 F.2d at 1233. Copyright scholars to have considered the issue concur in this reasoning. *See, e.g.*, James Lincoln Young, *Criminal Copyright Infringement and a Step Beyond*, 30 Copyright L. Symp. (ASCAP) 157, 169 (1980) (observing that, in light of 18 U.S.C. § 2, including aiding and abetting language directly in 17 U.S.C. § 506 "would have been merely

---

[8] Vaulin offers no argument as to why 18 U.S.C. § 371 should not apply, and the Court sees no reason it should not.

superfluous"); *accord* 5 Nimmer on Copyright § 15.01 (2017) ("Persons who knowingly and willfully aid or abet copyright infringement are subject to the same criminal penalties as apply to the principal."); Benton Martin & Jeremiah Newhall, *Criminal Copyright Enforcement Against Filesharing Services*, 15 N.C. J. L. & Tech. 101, 108 (2013); Note, *The Criminalization of Copyright Infringement in the Digital Era*, 112 Harv. L. Rev. 1705, 1709 n.39.[9]  And, while no court appears to have considered this precise issue, numerous courts have permitted indictments to proceed or have upheld convictions under 18 U.S.C. § 2 for aiding and abetting violations of 17 U.S.C. § 506.  *E.g.*, *United States v. Frison*, 825 F.3d 437, 438 (8th Cir. 2016), *cert. denied*, 137 S. Ct. 520 (2016); *United States v. Stevens*, 543 F. Supp. 929, 948–49 (N.D. Ill. 1982); *see also United States v. Dove*, No. 2:07CR00015, 2008 WL 3979467, at *3 (W.D. Va. Aug. 25, 2008) (sustaining conviction where court instructed jury on aiding and abetting a violation of 17 U.S.C. § 506).[10]

---

[9]    Vaulin cites one scholar's assertion that "countering what had been a trend of expansion in the area of criminal sanctions, the Copyright Act of 1976 eliminated the provisions for aiding and abetting."  Irina D. Manta, *The Puzzle of Criminal Sanctions for Intellectual Property Infringement*, 24 Harv. J.L. & Tech. 469, 481 (2011).  But this article does not mention 18 U.S.C. § 2, let alone explain why it would not apply in lieu of the provisions in the 1909 Act.

[10]    In support of his position, Vaulin relies upon *United States v. LaMacchia*, 871 F. Supp. 535 (D. Mass. 1994), which states that "[i]n 1976, Congress revamped the Copyright Act by eliminating the crime of aiding and abetting copyright infringement."  *Id.* at 539. *LaMacchia*, however, did not involve a prosecution for aiding and abetting copyright infringement, makes no mention of 18 U.S.C. § 2, and provides no analysis as to why it would not apply in lieu of the provisions in the 1909 Act.  Accordingly, the Court does not find it very instructive to the issue at hand.

Vaulin also expresses concern that the Government's theory could expose search engines, such as Google, to criminal liability. He points out that a Google search readily returns links to torrent sites. Reply at 11. Given the limited nature of the present inquiry—whether the indictment in this case satisfies Rule 7(c)(1)—the Court is hesitant to speculate as to whether and under what circumstances Google or any other search engine operators might be charged with aiding and abetting criminal copyright infringement. Nevertheless, the Court makes two brief observations. First, as the Government noted at oral argument, "Google doesn't solicit and reward others for uploading torrent files for copyrighted media," as Vaulin is charged with doing in this case. Oral Arg Tr. at 40:5–6. And, if Google were to engage in such conduct, at least one court has suggested that Google might be civilly liable for contributory infringement under certain circumstances. *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1172 (9th Cir. 2007) ("Google could be held contributorily liable if it had knowledge that infringing [works] were available using its search engine, could take simple measures to prevent further damage to [plaintiff's] copyrighted works, and failed to take such steps."). For present purposes, though, the Court need not decide whether and when a search engine operator might engage in conduct sufficient to constitute aiding and abetting criminal copyright infringement. The issue here is whether 18 U.S.C. § 2 applies to 17 U.S.C. § 506. The Court is persuaded that it does.[11]

---

[11]    Vaulin also questions whether the indictment, if permitted to stand, will "improperly criminalize video streaming." Reply at 9 (citing *Flava Works v. Gunther*, 689 F.3d 754 (7th Cir. 2012)). The primary acts of infringement on which the indictment is predicated, however, are (1) the unauthorized "reproduction and distribution" of copyrighted works,

### iii. Void-for-Vagueness Challenge

Finally, Vaulin argues that, if 17 U.S.C. § 506, 18 U.S.C. § 2, and 18 U.S.C. § 371 permit prosecution for conspiring to commit or aiding and abetting criminal copyright infringement, the statutes are void for vagueness. To satisfy the due process concerns underlying the void-for-vagueness doctrine, "'a penal statute [must] define the criminal offense (1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Skilling*, 561 U.S. at 402–03 (alteration in original) (quoting *Kolender v. Lawson,* 461 U.S. 352, 357 (1983)). Here, where First Amendment concerns are not at issue, the question is "whether a statute is vague as applied to the particular facts at issue." *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010). Thus, the relevant question is whether Vaulin was "on notice that [his] conduct was illegal." *See United States v. Calimlim*, 538 F.3d 706, 710–11 (7th Cir. 2008).

Here, the statutes at issue are sufficiently definite such that ordinary people can understand what conduct is prohibited. 17 U.S.C. § 506(a) criminalizes "willful[] infringe[ment]," and specifies, for purposes of 17 U.S.C. § 506(a)(1)(B), that

---

and (2) the unauthorized "distribution . . . by making [ ] available" copyrighted works, both of which are acts of infringement identified in 17 U.S.C. § 506. *See, e.g.*, Indictment, Count 1 ¶ 2. Thus, the principal infringers in this case (KAT's users) are alleged to have reproduced and distributed copyrighted works, rather than merely streamed them, as viewers did in *Flava*. 689 F.3d at 756–57. Indeed, *Flava* made clear that uploading and downloading copies of works, as opposed to mere streaming, constitutes copyright infringement. *Id.* And, as the court also noted in *Flava*, websites that encourage, invite, and induce others to distribute copies of copyrighted works may be civilly liable for contributory infringement. *Id.* at 758–59.

this infringement occurs by "the reproduction or distribution" of "copies or phonorecords" of "copyrighted works." 17 U.S.C. § 506(a)(1)(A)–(B). In the context of 17 U.S.C. § 506(a)(1)(C), the statute plainly states that infringement occurs "by the distribution of a work being prepared for commercial distribution, by making it available on a computer network accessible to members of the public, if such person knew or should have known that the work was intended for commercial distribution." 17 U.S.C. § 506(a)(1)(C). Here, the indictment charges that Vaulin and his co-defendants conspired and aided abetted precisely this activity.

Moreover, based on the allegations in the indictment, Vaulin's own actions evidenced his understanding that his conduct was illegal. In particular, the indictment alleges that Vaulin and his co-defendants "changed and caused others to change the website domain name for KAT several times . . . in part to avoid and circumvent court orders that sought to block users' access to KAT because of KAT's copyright infringement." Indictment, Count 1 ¶ 16. It further alleges that Vaulin and his co-defendants operated KAT and related websites "through a Ukrainian-based company called 'Cryptoneat' in order to hide their operations." *Id.*, Count 1 ¶ 24. Assuming the truth of these allegations, Vaulin knew or must have known that his activities could subject him to criminal prosecution. *See Frison*, 825 F.3d at 441–47 (rejecting a void-for-vagueness challenge where defendant was convicted of conspiring to violate and aiding and abetting violations of 17 U.S.C. § 506, and had actual notice that his conduct was unlawful).

Nor does the indictment seek to enforce the statutes at issue arbitrarily or in a discriminatory fashion. A statute is susceptible to discriminatory or arbitrary enforcement where "it impermissibly delegates to law enforcement the authority to arrest and prosecute on an ad hoc and subjective basis." *Bell v. Keating*, 697 F.3d 445, 462 (7th Cir. 2012) (internal quotation marks and citation omitted). 17 U.S.C. § 506, however, specifically delineates the willful infringement to which it applies. And the fact that Vaulin is charged with conspiracy and aiding and abetting does not indicate otherwise. *United States v. Cueto*, 151 F.3d 620, 636 (7th Cir. 1998) (rejecting a void-for-vagueness challenge to 18 U.S.C. § 371 where "the indictment specifically describe[d] the conduct charged" and "identifie[d] [defendant's] specific conduct which furthered the conspiracy"); *United States v. Morrison*, 521 F. Supp. 2d 246, 258 (E.D.N.Y. 2007) (observing that "the scienter requirement of 18 U.S.C. § 2 narrows the scope of the prohibited conduct and in so doing, limits prosecutorial discretion," and therefore rejecting a void-for-vagueness challenge), *recons. on other grounds*, 706 F. Supp. 2d 304 (E.D.N.Y. 2010). Here, Vaulin is charged with conspiring and aiding abetting the willful unauthorized distribution and downloading of copyrighted movies and other media. This is the very core of the conduct proscribed under the Copyright Act. *See Frison*, 825 F.3d at 446–47 (upholding a conviction for conspiring and aiding abetting copyright infringement where the defendant "present[ed] no reason to believe the statutes at issue did not clearly apply to him"). The Court therefore rejects Vaulin's void-for-vagueness challenge.

### 3. Sufficiency of Indictment Under Rule 7(c)(1)

In addition to challenging the core theory underlying the indictment, Vaulin maintains that, even accepting the validity of the theory *arguendo*, the indictment fails to satisfy Rule 7(c)(1) in various respects. First, he contends that the indictment fails to identify a principal who has committed a violation of 17 U.S.C. § 506. It is not necessary, however, to identify a principal in an indictment charging aiding and abetting under 18 U.S.C. § 2. *United States v. Somers*, 950 F.2d 1279, 1283 (7th Cir. 1991) (rejecting this argument as a basis to dismiss an indictment because "in order to convict a defendant as an aider or abettor under [18 U.S.C.] § 2, it has never been necessary to convict or even identify the principal, provided there is sufficient evidence to establish the commission of the substantive offense"). Moreover, aiding and abetting under 18 U.S.C. § 2 "'need not be specifically pleaded'" in an indictment, and "'a defendant indicted for a substantive offense can be convicted as an aider and abettor' upon a proper demonstration of proof so long as no unfair surprise results." *United States v. Galiffa*, 734 F.2d 306, 312 (7th Cir. 1984) (quoting *United States v. Tucker*, 552 F.2d 202, 204 (7th Cir. 1977)).

Vaulin also takes issue with the sufficiency of the Government's allegations of aiding and abetting violations of 17 U.S.C. § 506. But the indictment satisfies Rule 7(c)(1) in this regard. Counts 2 through 13 tracks the elements of 17 U.S.C. § 506, identify the movies that are the subject of the alleged acts of copyright infringement and the dates on which the copyrights were infringed, and describe in detail how Vaulin and his co-defendant aided and abetted the acts of infringement.

Indictment, Count 1 ¶ 1; *id.*, Counts 2–13. Of course, at trial, the Government will have the burden of proving that acts of infringement occurred that violated 17 U.S.C. § 506. *United States v. Motley*, 940 F.2d 1079, 1081 (7th Cir. 1991) ("'[I]t is hornbook law that a defendant charged with aiding and abetting the commission of a crime by another cannot be convicted in the absence of proof that the crime was actually committed'" (quoting *United States v. Ruffin*, 613 F.2d 408, 412 (2d Cir. 1979)).). It will also have to prove that Vaulin acted with the same state of mind as that required for the principal offense—*i.e.*, willfulness. *United States v. Valencia*, 907 F.2d 671, 680 (7th Cir. 1990). At this stage, however, the Government need only describe Vaulin's actions so as to satisfy Rule 7(c)(1). It has carried this burden.

As part of this argument, Vaulin also suggests that liability under 17 U.S.C. § 506(a)(1)(C) requires actual dissemination of a copyrighted work, rather than merely making the work available.[12] Def.'s Mem. at 14–15. He therefore contends that the indictment's allegations of making copyrighted media available, without more, are insufficient. This position, however, cannot be reconciled with the statute's text. It states, in relevant part:

> Any person who willfully infringes a copyright shall be punished as provided under [18 U.S.C. § 2319], if the infringement was committed . . . by the distribution of a work being prepared for commercial distribution, *by making it available* on a computer network accessible to members of the public, if such person knew or should have known that the work was intended for commercial distribution.

---

[12] The issue is somewhat academic, or at least premature, because the Government has suggested that it intends to put on evidence of actual downloads of movies made possible by KAT's torrent files. Oral Arg. Tr. at 31:12–14.

17 U.S.C. § 506(a)(1)(C) (emphasis added).  In interpreting this provision, the Court must give its unambiguous terms their plain meaning.  *River Rd. Hotel Partners, LLC v. Amalgamated Bank*, 651 F.3d 642, 649 (7th Cir. 2011).  The text of 17 U.S.C. § 506(a)(1)(C) plainly criminalizes willful copyright infringement in the form of distributing a work "by making it available."  Thus, one can violate 17 U.S.C. § 506(a)(1)(C) by making available a copyrighted work, even without disseminating actual copies of it.

Vaulin seeks to evade the plain text of 17 U.S.C. § 506(a)(1)(C) by summoning a debate that has long plagued civil copyright law.  To wit, Section 106 of the Act enumerates exclusive rights in copyrighted works, one of which is "to distribute copies . . . of the copyrighted work."  17 U.S.C. § 106(3).  "Distribute," however, is not defined, and § 106(3) does not indicate whether liability can attach for making a copyrighted work available.  Thus, courts are divided on how to interpret "distribute" for purposes of 17 U.S.C. § 106(3).  *Compare Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 199, 203 (4th Cir. 1997) (holding that making available a copyrighted work to the public constitutes distribution), *with Perfect 10*, 508 F.3d at 1162 (rejecting an argument that merely making available a work constitutes distribution).

Whichever side one may chose in that debate, it is of no consequence to 17 U.S.C. § 506(a)(1)(C), which plainly envisions infringement of a commercial copyrighted work by "making it available on a computer network accessible to members of the public."  *See Capitol Records, Inc. v. Thomas*, 579 F. Supp. 2d 1210,

1218 (D. Minn. 2008) (contrasting 17 U.S.C. § 106(3) with 17 U.S.C. § 506(a)(1)(C) and concluding that "when Congress intends distribution to encompass making available . . . it has demonstrated that it is quite capable of explicitly providing that definition within the statute"); *accord BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634, 668 (E.D. Va. 2015).[13] Accordingly, under the plain meaning of 17 U.S.C. § 506(a)(1)(C), the indictment's charges related to making copyrighted works available can stand.[14]

### III.    Conclusion

For the foregoing reasons, Vaulin's motion to dismiss the indictment [26] is denied.  A status hearing is set for August 24, 2017, at 9:30 a.m.

**IT IS SO ORDERED.**                    **ENTERED        8/4/17**

_____

**John Z. Lee**
**United States District Judge**

---

[13]    In support of his position, Vaulin presents *In re Napster, Inc. Copyright Litigation*, 377 F. Supp. 2d 796 (N.D. Cal. 2005).  It is by no means clear, however, that the *Napster* court believed proof of actual dissemination was required under 17 U.S.C. § 506(a)(1)(C).  In any event, insofar as *Napster* suggests that the plain language of 17 U.S.C. § 506(a)(1)(C) requires proof of infringement other than by distributing "a work being prepared for commercial distribution, by making it available on a computer network accessible to member of the public," the Court respectfully disagrees.  The plain language of the statute identifies such conduct as actionable under 17 U.S.C. § 506(a)(1)(C).

[14]    Had the Court dismissed the indictment's charges relating to criminal copyright infringement, Vaulin sought to dismiss the money laundering charges as well due to the absence of underlying criminal activity.  Def.'s Mem. at 16–17.  Because the charges relating to criminal copyright infringement stand, this request is also denied.